IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WILLAMETTE CREST GAMING, LLC; JULIA WERNER; MICHAEL WERNER; DAVID GLAD; and TRICIA GLAD, | CV-09-461-ST |
| Plaintiffs, | FINDINGS AND RECOMMENDATION |
| v. | |
| PLAY N TRADE FRANCHISE, INC.; SAN CLEMENTE CAPITAL, LLC; CAAZ MANAGEMENT, LLC; T-STREET MANAGEMENT, INC.; RON SIMPSON; and YUVI SHMUL, | |
| Defendants. | |

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Willamette Crest Gaming, LLC ("WCG"), entered into a franchise agreement with defendant Play N Trade Franchise, Inc. ("PNT"), to operate PNT franchises in Oregon. WCG and its four members filed suit on March 23, 2009, in the Multnomah County Circuit Court for the State of Oregon against PNT and various individuals and entities who own and

1 - FINDINGS AND RECOMMENDATION

manage PNT, alleging a violation of Oregon's franchising laws (ORS 650.020; OAR 441-325-0020) and fraud and seeking relief in the form of rescission of the franchise agreement and money damages. After defendants timely removed the action to this court pursuant to 28 USC §§ 1332 and 1441(b), they filed a motion to compel arbitration, or in the alternative, to dismiss for improper venue (docket #4). For the reasons that follow, the motion to compel arbitration should be GRANTED.

## FINDINGS

### I. Background

In January 2007, one of plaintiffs, Julia Werner, contacted PNT for information about a franchise opportunity. Complaint, ¶ 9. As a result of the information provided, plaintiffs decided to purchase 11 PNT franchises, signed a franchise agreement with PNT on February 15, 2007, and paid a franchise fee to PNT of $115,000.00. *Id*, ¶¶ 9-10; Declaration of Tom Bozarth (docket #6) ("Bozarth Decl."), ¶ 9, Ex. 1. On February 27, 2007, WCG was formed as an Oregon limited liability company, with the four individual plaintiffs as its members, for the sole purpose of owning and operating the PNT franchises. Complaint, ¶ 10.

After the purchase, WCG opened four PNT franchise locations and spent approximately one million dollars in that process. *Id*, ¶ 11. Seven franchises remain unopened, and WCG has not earned any profits from any of the four stores. *Id*.

Plaintiffs filed this lawsuit seeking to recover damages incurred as a result of representations or omissions allegedly made by defendants in the course of negotiating the franchise agreement. The franchise agreement includes arbitration, forum selection, and choice-

of-law provisions purporting to control proceedings between the two parties in the event of a

dispute.

Defendants seek to enforce the arbitration clause in § 11.03 which provides in relevant

part as follows:

> (a) Except [as otherwise provided in section 11.02], any dispute between (i) Franchisor or its related entities, and (ii) Franchisee or a Principal or any of their related entities, *arising out of or relating to this Agreement or its breach, including without limitation, any claim that this Agreement or any of its parts, is invalid, illegal or otherwise voidable or void*, which has not been resolved in accordance with section 11.03 hereof, will be resolved by submission to binding arbitration before and in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), provided however that the arbitrator selected must be a licensed attorney a [*sic*] minimum of five years experience in franchise law . . . .
>
> (b) Except as [otherwise provided in this agreement], California law shall be applied to determine all arbitrated issues. The Federal Arbitration Act (9 USC § 1 *et seq.*) and the federal common law of arbitration govern the enforceability of the agreement to arbitrate contained herein. All arbitration hearings and other proceedings shall take place in Orange County, California, or other county where the principal place of business of Franchisor is then located.

Boazarth Decl, Ex. 1, p. 26 (emphasis added).

Alternatively, defendants seek to dismiss this case based on the venue provision in

§ 11.05 which provides that "[a]ny and all court proceedings arising from matters described in

section 11.02 hereof shall be brought in, and only in, a federal or state court of competent

jurisdiction in California." *Id* at 27.

///

///

///

3 - FINDINGS AND RECOMMENDATION

## II.   Motion to Compel Arbitration

### A.   Federal Arbitration Act Standards

Both parties agree that the Federal Arbitration Act, 9 USC §§ 1-16 ("FAA"), applies to the arbitration clause at issue. In particular, the FAA provides that written agreements to arbitrate contained in any contract "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2. This provision "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]" *Buckeye Check Cashing, Inc. v. Cardegna*, 546 US 440, 443 (2006).

The FAA "permits a party 'aggrieved by the alleged . . . refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F3d 1126, 1130 (9th Cir 2000), quoting 9 USC § 4. Federal courts are required to "rigorously enforce agreements to arbitrate." *Shearson/American Express, Inc. v. McMahon*, 482 US 220, 226 (1987) (citation omitted). The FAA "'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron*, 207 F3d at 1130 (emphasis in original), quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 US 213, 218 (1985). "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Id*.

4 - FINDINGS AND RECOMMENDATION

Plaintiffs neither plead nor argue that the arbitration clause itself, as opposed to the entire franchise agreement, is unenforceable based on such doctrines as procedural or substantive unconscionability.[1] *See, e.g.*, *Buckeye*, 546 US at 444 (delineating the two species of challenges to arbitration agreements). Instead, they oppose arbitration on the basis that their claims are not bound by the franchise agreement or within the scope of the arbitration clause because they are premised solely on defendants' pre-contract actions, namely, their fraudulent misrepresentations and failure to comply with the Oregon franchise law in disclosing certain information to them before they entered into the franchise agreement.

The question of "whether the parties have submitted a particular dispute to arbitration, *i.e.*, the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 US 79, 83 (2002) (alterations in original), quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 US 643, 649 (1986). Neither party contends that the arbitration clause submits the question of arbitrability to the arbitrator, and the arbitration clause expressly precludes such a contention. Bozarth Decl., ¶ 9, Ex. 1, p. 26 (§§ 11.02(c), 11.03(b)).

### B.  Arbitrability of Claims

The interpretation and enforcement of an arbitration agreement is determined by federal substantive law. *Buckeye*, 546 US at 445; *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 US 1, 22-24 (1983). However, to determine whether the parties agreed to arbitrate a particular dispute in the first place, courts apply "ordinary state-law principles that govern the

---

[1] For example, an arbitration clause is unenforceable if it does not allow for punitive damages and attorney's fees available under a statute. *Graham Oil Co. v. ARCO Products Co.,* 43 F3d 1244, 1248 (9th Cir), *cert denied*, 516 US 907 (1995).

formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 US 938, 944 (1995). This court therefore must determine whether the parties intended that the claims at issue here would be subject to arbitration. *See Black v. Arizala*, 337 Or 250, 267, 95 P3d 1109, 1117 (2004) (object in construing provision of a contract is to "discern the intent of the parties in entering into that agreement").

The arbitration clause in the franchise agreement is very broad. It provides that "any dispute . . . arising out of or relating to this Agreement . . . including . . . any claim that this Agreement . . . is invalid, illegal or otherwise voidable or void . . . will be resolved by submission to binding arbitration . . . ." Despite plaintiffs' attempt to artfully plead around this arbitration clause, both claims fall within its ambit.

Plaintiffs' first claim alleges that defendants violated the Oregon Franchise Act ("OFA"). ORS 650.005 - .100. The OFA requires a franchisor seeking to sell or to offer for sale a franchise in Oregon to disclose to the prospective franchisee information about the franchise as required by federal law or otherwise material to the sale. OAR 441-325-0020(1)-(2), (4); 16 CFR pt. 436. Failure to disclose this information, or providing false or misleading information, is a violation of ORS 650.020 which provides as follows:

> (1) Any person who sells a franchise is liable as provided in subsection (3) of this section to the franchisee if the seller:
>
> > (a) Employs any device, scheme or artifice to defraud; or
> > (b) Makes any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

ORS 650.020; *see also* OAR 441-325-0020(3).

6 - FINDINGS AND RECOMMENDATION

///

///

Subsection (3) of ORS 650.020 allows "the franchisee" to "recover any amounts to which the franchisee would be entitled upon an action for a rescission" and reasonable attorney fees, both of which plaintiffs seek here.

Plaintiffs' second claim alleges common law fraud. Specifically, plaintiffs allege that defendants made certain false representations and omissions of material fact that they knew to be false and material with the intent that plaintiffs would accept those representations and omissions, and that plaintiffs relied on those representations and omissions. *See State v. Moyer*, 225 Or App 81, 110, 200 P3d 619, 635 (2009) (stating elements of common law fraud). As a result, plaintiffs "have been harmed and have suffered damages including but not limited to, actual and lost opportunity damages" and seek rescission of the franchise agreement, money damages, and attorney's fees. Complaint ¶¶ 26, 27.

Although both claims rely solely on defendants' conduct prior to date of the franchise agreement, they seek to recover injures caused by defendants inducing them to enter into the franchise agreement and also to rescind the franchise agreement. In crafting a rescission remedy, it may be necessary to interpret provisions of the franchise agreement in order to separate those actions which were based upon, and taken in furtherance of, the contractual relationship between the parties, for which plaintiffs would be entitled to recover, from those actions which were superfluous or unrelated and, therefore, would not be recoverable under the remedy of rescission. Because the measure of damages in this case may require reference to and interpretation of the

7 - FINDINGS AND RECOMMENDATION

franchise agreement, the claims necessarily "relate to" the franchise agreement. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1916 (unabridged ed. 1981) (defining "related," in part, as "having relationship[,] connected by reason of an established or discoverable relation.")

If plaintiffs' claims were entirely unrelated to the franchise agreement, such as a defamation claim having nothing to do with plaintiffs' qualifications to be a franchisee, then conceivably plaintiffs could seek damages for that unrelated conduct and continue to carry out the franchise agreement's terms. However, their requested remedy shows that they are not simply complaining about pre-contract activity unrelated to the franchise agreement, but about conduct directly related to the validity of that agreement. As specifically stated in the arbitration clause, disputes over the validity of the agreement must be submitted to arbitration.

Moreover, challenges to the validity of a contract *in toto* based on fraud in the inducement is precisely the type of claim the Supreme Court has declared should go to arbitration. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 US 395, 398, 406-07 (1967), the parties agreed to a contract with an arbitration clause which read that "[a]ny controversy or claim arising out of or relating to this Agreement . . . shall be settled by arbitration . . . in accordance with the rules . . . of the American Arbitration Association." *Id* at 398. Prima Paint sought rescission of the contract on the basis of fraudulent inducement, alleging that the defendant had not revealed during contract negotiations its plans to file bankruptcy. The court concluded that the language of the arbitration clause was "easily broad enough to encompass Prima Paint's claim that both execution and acceleration [of the whole contract] were procured by fraud," *id* at 406, and held that consideration of a claim of fraud in the inducement of a contract "is for the arbitrators and not for the courts[.]" *Id* at 400.

8 - FINDINGS AND RECOMMENDATION

Similarly, in *Southland Corp v. Keating*, 465 US 1, 15 n7 (1984), the Supreme Court found that an arbitration clause which required "any controversy or claim arising out of or relating to this agreement . . . [to] be settled by arbitration" was sufficiently broad to cover claims alleging violations of the disclosure requirements of the California Franchise Investment Law, Cal. Corp. Code, §§ 31000-31516 (1980). Like the OFA, California law provides a cause of action to franchisees who purchased their franchise in reliance on false or misleading statements. Cal. Corp. Code § 31301. Plaintiffs have identified nothing to distinguish their first claim for a violation of OFA's disclosure requirements from the claim brought in *Keating*.

Plaintiffs seek to escape the force of these precedents by leaving out any reference to the franchise agreement in their claims. However, the underlying facts giving rise to their claims betray the similarity of their claims to those at issue in *Prima Paint* and *Keating*. The representations and omissions relied on by plaintiffs were made in the course of defendants' attempts to induce them into purchasing a PNT franchise. Any damages suffered as a result would relate to the resources invested in establishing that franchise. Like the claims in *Prima Paint*, plaintiffs' claims relate to actions they took (*i.e.* entering into a franchise agreement and taking steps to establish PNT franchises), but would not have taken had defendants made the proper disclosures. Given the similarity between their claims and the Supreme Court precedent on point, the inescapable conclusion is that plaintiffs' claims must be submitted to arbitration.

Plaintiffs alternatively argue that this court should follow the Oregon Supreme Court's analysis in *Black*, 337 Or at 270, 95 P3d at 1119, which held that a venue selection clause in a contract did not apply to a dispute over the defendants' actions that predated execution of the contract. The plaintiffs in *Black* sued a company in which they had invested, alleging, among

9 - FINDINGS AND RECOMMENDATION

other things, violations of state and federal securities laws and common law fraud.  Their allegations centered on representations and omissions made by the defendants in the course of inducing plaintiffs to invest in the company.  Defendants argued that the plaintiffs' claims were subject to the venue selection clause because they related to the contract:  if plaintiffs had not entered into the agreement, they would have suffered no damages from any alleged misrepresentation and could make no claims.  Plaintiffs argued that because their claims focused solely on actions that predated the execution of the contract, the court would not be required to interpret any provision of the contract; thus, plaintiffs could establish their right to rescind without reference to any provision of the contract.

      The Oregon Supreme Court sided with plaintiffs.  Following *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A2d 149 (Del 2002), *cert denied*, 538 US 1032 (2003), it concluded that the analysis should focus on whether plaintiffs' claims sought to enforce the rights and duties created by contract or rights and duties created by sources of law external to the contract.  *Black*, 337 Or at 269, 95 P3d at 1119.  The court determined that the nature of the rights the parties sought to enforce, namely common-law torts and securities law, were not contractual in nature.  "The fact that the parties' contract may help to explain their securities transaction and, potentially, the extent of plaintiffs' alleged economic injuries does not transform plaintiffs' action into a claim that arises from the contract." *Id* at 270, 95 P3d at 1119.  The court held that because "the parties' agreement is not the source of the legal action that plaintiffs filed[,] . . . the venue provision of that agreement does not apply to plaintiffs' claims." *Id*.

      Though the analysis in *Black* is persuasive, it does not change the result of this case for several reasons.  First, and foremost, this court is bound by the controlling precedent applying

the FAA. While questions of contract formation are determined by state law principles, the scope and application of the arbitration clause is determined by "substantiative federal law." *Keating*, 465 US at 12. Supreme Court cases interpreting similar arbitration provisions have found the language broad enough to compel arbitration of disputes nearly identical to the one at issue here. This reason alone is sufficient to distinguish *Black* and to grant defendants' motion to compel arbitration.

This precedent is similarly sufficient to distinguish *Parfi* on which *Black* relied. *Parfi* involved a breach of fiduciary duty claim brought by a minority shareholder dissatisfied with various actions of the controlling shareholder. The court held that the defendants were not entitled to arbitration of this claim based upon the arbitration clause in an underwriting agreement which required the parties to submit to arbitration "any dispute, controversy, or claim arising out of or in connection with" the agreement. *Parfi*, 817 A2d at 155. The court concluded that fiduciary duty claims, which were independently grounded in Delaware corporation law and which did not bear on any duties and obligations under the agreement, were not subject to arbitration. The court reasoned that the term "arising out of or in connection with" must be considered in light of the fact that the parties did not intend to arbitrate every possible breach of duty that could occur between them, but rather only those that touched on the set of rights, obligations, and duties created by the agreement. As a result, plaintiffs could "maintain an action based on the alleged breaches of the independent set of fiduciary duties that [defendant] owes . . . even though the claims arise from some or all of the same facts that relate to the transactions that provided the basis for its contract claims." *Id* at 156-57.

11 - FINDINGS AND RECOMMENDATION

Like *Black*, and unlike this case, *Parfi* did not involve the interpretation or application of the FAA or the substantive federal law governing arbitrability thereunder. *Parfi's* broad holding that an arbitration clause in an agreement "no matter how broadly drafted, can reach only the claims within the scope of the contract," *id* at 151, is irreconcilable with cases such as *Prima Paint* and *Keating* which clearly involved rights derived from extra-contractual sources. *See also Shearson/American Express* 482 US at 226 ("[The] duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights.")

Second, the arbitration clause at issue here is broader than the venue selection clause in *Black*. The agreement in *Black* required venue (and arbitration) in San Juan, Puerto Rico, for "any legal action *arising from* this agreement." *Black*, 337 Or at 266, 95 P3d at 1117 (emphasis added). The arbitration clause at issue here requires "any dispute . . . arising out of *or relating to*" the franchise agreement to be submitted to arbitration. As *Black* noted, the verb "arise" means "'to originate from a specific source[,] 'to come into being[,]' and 'to become operative.'" *Id* at 267, 95 P3d at 1117 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 117 (unabridged ed. 1993). A dispute may clearly "relate to" an agreement without "arising from" it. Such is the case here.

Finally, unlike *Black*, the arbitration clause here also includes within its scope "any claim that this Agreement . . . is invalid, illegal or otherwise voidable or void." Contracts procured through fraud or mutual mistake are voidable. *See In re Marriage of Woods*, 207 Or App 452, 463, 142 P3d 1072, 1077 (2006) (contract is voidable if "mutual mistake" made by parties in contracting frustrates the purpose of the contract); *Lesher v. Strid*, 165 Or App 34, 41-42, 996 P2d 988, 993 (2000) (contract voidable and party entitled to rescission where one party's assent

12 - FINDINGS AND RECOMMENDATION

is induced by "innocent misrepresentation" on which the party justifiably relied); *see also Insurance Co. of N. Am. v. Brehm*, 257 Or 385, 393-94, 478 P2d 387, 391 (1970) (explicating when right to rescind arises due to contract made voidable by fraud or material misrepresentation), citing RESTATEMENT, CONTRACTS, § 477.  By referencing these types of disputes, the parties effectively considered the possibility that sources of law or events outside the scope of the franchise agreement's terms may affect the performance under the agreement, and specifically agreed to submit these types of disputes to arbitration.  Thus, the parties agreed to arbitrate disputes beyond those whose source was the obligations and duties created by the franchise agreement.

Given the broad scope of the arbitration clause and controlling precedent, the court finds that plaintiffs' claims are subject to arbitration.

### C.     Nonsignatories to Arbitration Clause

Even if their claims fall within the scope of the arbitration clause, plaintiffs assert that this court has no authority to compel the individual plaintiffs, as nonsignatories to the franchise agreement, to submit to arbitration.  Conveniently, this argument also provides a basis, in their view, of distinguishing *Prima Paint* and its progeny, which, according to plaintiffs, did not involve nonsignators to the arbitration agreement.  This argument fails.

To begin with, ORS 650.020 makes "any person who sells a franchise" liable "to the franchisee" if they engage in certain conduct.  Thus, the only party with standing to bring a claim under ORS 650.020 is the franchisee.  The OFA defines "franchisee" as "a person to whom a franchise is sold by a franchisor."  ORS 650.005(5).  The franchise agreement lists only WCG as the franchisee.  Bozarth Decl., Ex. 1, p. 4.  Therefore, WCG, and not its members, owns the

13 - FINDINGS AND RECOMMENDATION

franchise and is the franchisee.  *See* ORS 63.239 (providing that "[a] member [of an LLC] is not a co-owner of and has no interest in specific limited liability company property.").  As a result, only WCG, and not its individual members, has standing to sue for violations of the OFA.  *See* ORS 63.077(2)(a).  Because the individual plaintiffs have no standing, they cannot state a claim for violation of the OFA and are not proper parties on the first claim.

With respect to the fraud claim, it is true that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs.*, 475 US at 648 (citation, quotes omitted).  Nevertheless, courts have recognized that "nonsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles."  *Comer v. Micor, Inc.*, 436 F3d 1098, 1101 (9th Cir 2006) (citation, quotes omitted).  "Among these principles are '1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.'"  *Id*, quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F3d 773, 776 (2nd Cir 1995).  However, "[a] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party . . . ."  *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F3d 125, 131 (2nd Cir 2003), quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F3d 88, 97 (2nd Cir 1999), *cert. denied*, 531 US 815 (2000).  "[A] willing signatory . . . seeking to arbitrate with a *non*-signatory that is unwilling . . . must establish at least one of [these] five theories."  *Id*, citing *Thomson-CSF*, 64 F3d at 776-80 (alteration in original).

The arbitration clause encompasses "any dispute between (i) Franchisor or its related entities and (ii) Franchisee *or a Principal* or any of their related entities" that arise from or relate to the franchise agreement.  Bozarth Decl., Ex. 1, p. 26 (emphasis added).  The individual

14 - FINDINGS AND RECOMMENDATION

plaintiffs, who are principals of WCG, are in a dispute with the franchisor that, as discussed above, arises out of and relates to the franchise agreement. Thus, they are expressly included within the arbitration clause.

Furthermore, two of the individual plaintiffs, Michael and Julia Werner, signed the franchise agreement as "principals." *Id* at 33. Even if they did not sign as individuals, the franchise agreement clearly makes them parties who are bound by all of its provisions. The first paragraph states that the franchise agreement is "made and entered into . . . by and between" PNT as the franchisor, WCG as the franchisee, "and each person owning 20% or more of Franchisee who will be a party to this Agreement (in such context, Principal) . . . ." *Id* at 4. Each of the individual plaintiffs owns more than 20% of WCG and thus is a party to the franchise agreement. In addition, § 2.05 of the franchise agreement provides that "[e]ach Principal hereby agrees, individually and jointly, to comply with and be bound by the terms and provisions of the Franchise Agreement." *Id* at 7. Therefore, the franchise agreement expressly incorporates and binds the individual plaintiffs, as well as WCG, to arbitration

Even if the franchise agreement did not control, defendants argue that the individual plaintiffs, as agents and principles of WCG, are bound to arbitrate by principles of agency and to hold otherwise would allow them to circumvent the contract and frustrate the purpose of the FAA. Plaintiffs respond that they seek to recover damages they individually have suffered as a result of defendants' misrepresentations to them. However, plaintiffs' allegations of misrepresentation all relate to those disclosures required by a franchisor to a franchisee. Complaint, ¶ 15. To the extent they relied upon these representations, the individual plaintiffs did so as agents of WCG, the franchisee. Consequently, any damages sustained as a result of

misrepresentations about the performance or nature of such a franchise are damages to WCG, and not to plaintiffs. Thus, plaintiffs' claims are derivative of WCG's claim and must be brought in arbitration.

### D. Dismissal or Stay

Although not addressed by the parties, the court notes that under § 3 of the FAA, a court has authority, upon application by one of the parties, to grant a stay pending arbitration, but also may dismiss all claims barred by an arbitration clause. *Sparling v. Hoffman Constr. Co., Inc.*, 864 F2d 635, 638 (9th Cir 1988); *see also Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.,* 586 F2d 143, 147 (9th Cir 1978) (holding that court has discretion to grant summary judgment when all the plaintiff's claims were barred by an arbitration clause).

Other courts have chosen to stay a case pending arbitration rather than dismiss it, even when confronted with an arbitration clause that covers all the plaintiff's claims. *See e.g., Bosinger v. Phillips Plastics Corp.,* 57 F Supp2d 986, 993 n 7 (SD Cal 1999). However, this court recommends dismissal of this case for two reasons. First, no party has requested that this case be stayed pending arbitration. Second, the arbitration clause requires arbitration of both of plaintiffs' claims, such that nothing will remain for the court to resolve after arbitration is completed. *Sparling*, 864 F2d at 638.

### III. Motion to Dismiss for Improper Venue

Since this court finds that both claims are subject to arbitration and recommends dismissal, defendants' alternate motion to dismiss for improper venue is moot. According to the venue clause in § 11.05, California (where PNT's books, records, and business personnel are located), not Oregon, is the proper venue as to "all court proceedings arising from the matters

16 - FINDINGS AND RECOMMENDATION

described in section 11.02." Section 11.02 states that the "following disputes are not subject to the procedures stated in section 11.03 [the arbitration clause]," and then lists four categories of disputes. Thus, disputes not arbitrated in accordance with § 11.03 that fall within the scope of § 11.02 must be resolved in California courts. Since both of plaintiffs' claims fall within the arbitration clause (§ 11.03), they are not governed by the venue clause (§ 11.02).

## RECOMMENDATION

For the reasons set forth above, defendants' Motion to Compel Arbitration, or in the Alternative, to Dismiss for Improper Venue (docket #4) should GRANTED. The parties should be ordered to refer their claims to arbitration in accordance with § 11.03 of the franchise agreement, and this case should be dismissed.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due July 13, 2009. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 24th day of June, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge